| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS: | DEFENDANTS: |
|---|---|
| MARILYN D. GARNER, CHAPTER 7 TRUSTEE | RANDALL S. FERTITTA A/K/A RANDY S. FERTITTA; EQUITY TRUST COMPANY, AS SUCCESSOR IN INTEREST TO AND F/D/B/A STERLING TRUST COMPANY, IN ITS CAPACITY AS CUSTODIAN OF IRA # XX1101 FOR RANDALL S. FERTITTA, AND KJC WHOLESALE COMPANY |

| ATTORNEYS: (Firm Name, Address and Telephone No.) | ATTORNEYS: (If Known) |
|---|---|
| MICHAEL W. SEBESTA MAJEEDAH MURAD JORDAN MONTGOMERY LEWIS CAVAZOS, HENDRICKS, POIROT & SMITHAM, P.C. SUITE 570, FOUNDERS SQUARE 900 JACKSON STREET DALLAS, TX 75202 DIRECT DIAL: (214) 573-7306 | |

**PARTY:** (Check One Box Only)

☐ Debtor ☐ U.S. Trustee/
☐ Creditor    Bankruptcy Admin
☒ Trustee ☐ Other

**PARTY:** (Check One Box Only)

☐ Debtor ☐ U.S. Trustee/
☐ Creditor    Bankruptcy Admin
☐ Trustee ☒ Other

**CAUSE OF ACTION:** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Avoidance Action pursuant to 11 U.S.C. §§544, 547, 548 and 550; and Tex. Bus. & Com. Code §§24.005 and 24.008.

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property – other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection/revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce/sep property settlement/ decree
☐ 65-Dischargeability – other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory Judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

Other:
☐ SS-SIPA Case – 15 U.S.C. §78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand: **$115,638.09** |

Other Relief Sought: re-characterization of debt if appropriate. Additional dollar amounts against defendant KJC Wholesale.

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR:<br>KJC AUTO TITLE LOAN CORP – NORTH TEXAS *AKA* FIESTA AUTOMOBILE CLUB *FKA* KJC AUTO TITLE LOAN CORP | | BANKRUPTCY CASE NO.:<br>15-45114-MXM-7 |
| DISTRICT IN WHICH CASE IS PENDING:<br>NORTHERN DISTRICT OF TEXAS | DIVISIONAL OFFICE:<br>FORT WORTH DIVISION | NAME OF JUDGE:<br>HONORABLE MARK X. MULLIN |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF: | DEFENDANT: | ADVERSARY PROCEEDING NO.: |
| DISTRICT IN WHICH ADVERSARY IS PENDING: | DIVISIONAL OFFICE | NAME OF JUDGE: |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Michael W. Sebesta | | |
| DATE: December 19, 2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF): Michael W. Sebesta | |

# INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

Michael W. Sebesta
Texas Bar No. 24033171
Majeedah Murad
State Bar No. 24103590
Jordan Montgomery Lewis
State Bar No. 24092691
CAVAZOS, HENDRICKS,
POIROT & SMITHAM, P.C.
Suite 570, Founders Square
900 Jackson Street
Dallas, TX 75202
Phone: (214) 573-7306
Fax: (214) 573-7399
Email: msebesta@chfirm.com

Attorneys for Marilyn D. Garner, Trustee

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FT. WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | |
| KJC AUTO TITLE LOAN CORP - NORTH | § | Case No. 15-45114-MXM-7 |
| TEXAS *AKA* FIESTA AUTOMOBILE CLUB | § | |
| *FKA* KJC AUTO TITLE LOAN CORP, | § | |
| | § | |
| DEBTOR. | § | |
| | § | |
| | § | |
| MARILYN D. GARNER, | § | |
| CHAPTER 7 TRUSTEE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | Adversary No. _____ |
| | § | |
| RANDALL S. FERTITTA A/K/A RANDY S. | § | |
| FERTITTA; EQUITY TRUST COMPANY, AS | § | |
| SUCCESSOR IN INTEREST TO AND | § | |
| F/D/B/A STERLING TRUST COMPANY, IN | § | |
| ITS CAPACITY AS CUSTODIAN OF IRA # | § | |
| XX1101 FOR RANDALL S. FERTITTA, AND | § | |
| KJC WHOLESALE COMPANY, | § | |
| | § | |
| DEFENDANTS. | § | |

## TRUSTEE'S ORIGINAL COMPLAINT
## TO AVOID AND RECOVER TRANSFERS

COMES NOW, Marilyn D. Garner, duly appointed Chapter 7 Trustee ("Plaintiff" and/or "Trustee") for the bankruptcy estate of KJC Auto Title Loan Corp – North Texas aka Fiesta Automobile Club f/k/a KJC Auto Title Loan Corp (the "Debtor"), in the above-referenced Chapter 7 Bankruptcy Case and files this, her **Original Complaint to Avoid and Recover Transfers** (the "Complaint"). The Trustee files this Complaint requesting the following relief and in support thereof asserts the following:

## I. JURISDICTION AND VENUE

1.      This Complaint is an adversary proceeding brought pursuant to Rule 7001, Federal Rules of Bankruptcy Procedure; 11 U.S.C. §§544, 547, 548 and 550; and Tex. Bus. & Com. Code §§24.005 and 24.008.

2.      This adversary proceeding relates to the bankruptcy case of KJC Auto Title Loan Corp – North Texas aka Fiesta Automobile Club f/k/a KJC Auto Title Loan Corp, Debtor, Bankr. Case No. 15-45114-MXM-7, under Chapter 7 of the of Title 11 of the United States Code (the "Bankruptcy Code"), pending in the United States Bankruptcy Court for the Northern District of Texas – Fort Worth Division. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1334 and 157.

3.      Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

4.      The Trustee consents to entry of final orders or judgment by the Bankruptcy Court in this adversary proceeding.

## II. PROCEDURAL STATUS

5.      On December 29, 2015 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 7 of the Bankruptcy Code.

### III. PARTIES

6.     Plaintiff, Marilyn D. Garner is the Chapter 7 Trustee for the bankruptcy estate of the above referenced Debtor.

7.     Defendant, RANDALL S. FERTITTA A/K/A RANDY S. FERTITTA ("Randy Fertitta") is an individual and may be served in accordance with Federal Rule of Bankruptcy Procedure 7004(b) by mailing, via first class postage pre-paid regular mail, a copy of the Summons and Complaint to him at:

      a.   1210 W. Clay St., Ste. 10, Houston, TX 77019-4167; and / or

      b.   1514 Bevis St, Houston, TX 77008-4481.

8.     Defendant EQUITY TRUST COMPANY, AS SUCCESSOR IN INTEREST TO AND F/D/B/A STERLING TRUST COMPANY, IN ITS CAPACITY AS CUSTODIAN OF IRA # XX1101 FOR RANDALL S. FERTITTA ("Equity Trust")  is a South Dakota Corporation that, on information and belief, serves as the custodian of the retirement account for the benefit of Randall S. Fertitta, account # xx1101 of which Randy Ferttita is the owner, and may be served in accordance with Federal Rule of Bankruptcy Procedure 7004(b) by mailing, via first class postage pre-paid regular mail, a copy of the Summons and Complaint to:

      Its Registered Agent:  Corporation Service Company, 503 S. Pierre St, Pierre, SD 57501-4522.

9.     Randy Fertitta, and Equity Trust are hereinafter individually and collectively referred to as "Defendant." [1]

10.     Defendant, KJC Wholesale Company ("Wholesale") is a forfeited Texas Corporation, and may be served in accordance with Federal Rule of Bankruptcy Procedure 7004(b)

---

[1] The precise payment/transfer recipient(s) is unclear.  Each should refer to the word Defendant as referring to himself or herself when reading this Complaint.

by mailing, via first class postage pre-paid regular mail, a copy of the Summons and Complaint to:

> a. Its Registered Agent: Bruce A. Heitz at 2310 W. Interstate 20, Suite 101; Arlington, TX 76017-1663; and
>
> b. Its President: Clifton H. Morris III at 2705 Colonial Parkway; Fort Worth, TX 76109.

## IV. FACTS

11. Pursuant to 11 U.S.C. §§544, 547, 548 and 550; and Tex. Bus. & Com. Code §§24.005 and 24.008, the Trustee seeks to avoid and recover the total amount, or such other amount as the Court deems just and proper, of certain transfers and payments made by the Debtor to the Defendant during the four-year period, specifically, December 29, 2011 through December 29, 2015 (the "Relevant Period"), prior to the Petition Date (collectively, the "Fraudulent Transfer").

**Background**

12. The Debtor was formed on or about June 2, 2008. Clifton H. Morris III ("Morris") was the President and Chief Executive Officer of the Debtor at all times relevant to this Complaint. Morris was also the 100% owner of the Debtor at relevant times.

13. Morris is the son of Clifton Morris, Jr. ("Morris Jr."), who among other business successes, most notably served as the former CEO of AmeriCredit Corp, which was purchased in 2010 by General Motors for about $3.5 billion. On information and belief, Kenneth Edward Phillips ("Phillips") worked with AmeriCredit from 1990 through 2000 as Financial Analysis Manager where he developed strategic planning and analysis models used in the early stage development of AmeriCredit. Philips subsequently served as Chief Financial Officer for the Debtor at relevant times.

14.     On or about June 18, 2009, KJC Wholesale Company was formed. On information and belief, Morris was the owner, Director and/or President of Wholesale at relevant times. On or about August 2, 2013, Wholesale forfeited its existence due to failure to pay franchise taxes to the State of Texas.

15.     On information and belief, Morris and/or Phillips (collectively, "Solicitors") from 2009 through 2015 contacted, approached and solicited their friends and individuals in their networks, inviting them to invest in the Debtor and/or Wholesale. Some of these persons so approached had been high school friends or otherwise known to one or both of the Solicitors for years. On information and belief, some persons approached in this manner by the Solicitors then invited their friends and/or relatives to invest as well.

16.     On information and belief, some, if not many of such persons, were familiar with Morris Jr.'s and Phillip's reputations with AmeriCredit, giving the prospective investors a high regard and trust for the Solicitors.

17.     Over time, the Solicitors solicited additional investors for the ostensible purpose of capitalizing expansion of the Debtor's operations.

18.     A number of the foregoing persons (generally, the "Investors", or singularly, an "Investor") solicited in this manner did invest money as a result of the solicitations. On information and belief, in relation to each investment made, the Debtor, Wholesale, or Morris [2] typically signed a one year promissory note payable to the corresponding Investor in the amount of the investment, with the note bearing interest at a rate that was above market, and often exceeded 15%.

19.     On information and belief, the Debtor listed the Investors' Investments on its balance sheets as liabilities called "Investor Payable."

---

[2] Some early investments may have originated through or in connection with an entity called Bluewater Capital.

20.     Although it was not unusual for investments to have a maturity date, on information and belief, it was also not unusual for the Debtor and Investors to roll over the maturity date of the investments, whereby the Debtor continued to just pay interest on the investment after the original maturity date, whether or not a new investment instrument was issued.

**Defendant's Investment**

21.     On information and belief, Defendant made one or more such investments (collectively, the "Investment"), and is an Investor.

22.     On information and belief, Defendant made the Investment based on Defendant's relationship with Morris and /or Phillips, the associated Morris, Jr. and/or Phillips reputations, and because the investment was an above market investment opportunity.  On information and belief, Defendant did not request financial information such as balance sheets or profit and loss statements in connection with the Investment.  On information and belief, despite any recitations to the contrary in the Investment, Defendant did not require or obtain adequate security for the Investment.  On information and belief, Defendant's Investment was not an arms-length transaction.

23.     In connection with Defendant's Investment, records suggest a note may have been executed, payable by the Debtor, in the principal amount of $100,000, with an interest rate of 17.5% and a 30 day rollover term with termination at Lender's Discretion, but no executed note was found.

24.     On information and belief, the amount of interest to be paid on the Investment was above then current market rates, was a very good interest rate for the time period, and Defendant knew or should have known this at the time of making the Investment.

25.     On information and belief, Defendant is not and was not ordinarily in the business of making investments of the type represented by Defendant's Investment.

26.     A Debtor's spreadsheet, apparently last updated in July of 2012, Defendant's Investment was converted to equity, although the details are not presently clear, and the Trustee's investigation is ongoing.

**Debtor Operations**

27.     The Debtor originated and serviced vehicle title backed loans for one or more third party lenders. The Debtor provided storefront offices and marketing programs to promote loans to be made to customers by such lender(s). After loan origination, the Debtor collected payments from the customer / borrowers and serviced the loans for the lenders.

28.     Despite these activities, the Debtor's accounting records reflect it was losing substantial amounts of money, was always insolvent, and generally became progressively more insolvent. A summary of the first few years of operations is as follows:

| Year | 2009 | 2010 | 2011 |
|---|---|---|---|
| Profit / Loss for Year | -$754,898.37 | -4,031,263.93 | -$1,887,957.73 |
| Year End Assets | $2,730,983.88 | $4,943,159.76 | $4,373,968.47 |
| Year End Liabilities | $4,065,887.23 | $8,654,679.46 | $9,973,445.90 |
| Year End Equity | -$1,334,903.35 | -$3,711,519.70 | -$5,599,477.43 |

29.     On or about January 15, 2011, the Debtor entered a Credit Services Agreement (the "CSA") with Storehouse Lending, LLC ("Storehouse"), pursuant to which the Debtor provided loan origination and servicing for Storehouse as lender. That agreement was subsequently amended, and on or about January 1, 2013, the Debtor and Storehouse entered an Administrative Credit Services Agreement. Under that agreement, the Debtor guaranteed the loans made by Storehouse to borrowers, such that if those loans defaulted, the Debtor became obligated to buy those defaulted loans from Storehouse by paying Storehouse the outstanding principal and interest on such defaulted loans.

30.     The Debtor generated revenue by charging and receiving Credit Service

Organization fees ("CSO Fees") from the borrowers on the loans it originated. Borrowers paid one fee monthly to the Debtor. That payment was to cover the CSO Fee, as well as principal and interest owed to Storehouse. The Debtor was to retain the CSO Fee out of the payment, and forward to Storehouse the portion of the payment that was to be applied to the principal of the loan.

31.     On information and belief, the Debtor substantially overstated the CSO Fees and its profitability during the course of each year in the Relevant Period by not accounting until the end of the year for the portion of the CSO fees received that belonged to Storehouse. The Debtor's accounting records reflect that, with the exception of 2015, at the very end of each year during the Relevant Period the Debtor wrote down the amount of its income from CSO Fees by millions of dollars (a "Write Down").

32.     Furthermore, the Debtor's accounting records, adjusted by the Write Down, reflect that the Debtor's poor financial performance was worsening, as reflected in the following summary:

| Year | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Profit / Loss for Year | -$3,625,167.59 | -$7,882,384.68 | -$2,708,076.26 | $3,263,088.35[3] |
| Year End Assets | $4,204,764.27 | $4,617,664.23 | $4,298,766.06 | $4,074,699.64 |
| Year End Liabilities | $13,200,409.29 | $21,620,427.39 | $24,164,471.23 | $20,741,500.69 |
| Year End Equity | -$8,995,645.02 | -$17,002,763.16 | -$19,865,705.17 | -$16,666,801.05 |

33.     On information and belief, the purported profit for 2015 would, in reality, be a loss if the customary year end Write Down had completed before the Debtor's bankruptcy case was filed.

34.     Nevertheless, on information and belief, the solicitation of new Investments continued.

---

[3] Unlike prior years, Debtor had not yet done a year end Write Down of income in 2015.

**Existence of a Ponzi Scheme**

35.     With the assistance of her forensic accounting experts, the Trustee ascertained, and on information believes, that the Debtor began operating a Ponzi scheme in 2012.

36.     The Trustee's expert, William Brown, observed a suspicious pattern of funds moving between bank accounts and companies, to wit, the Debtor and Wholesale, which were indicative of an effort to conceal the true nature of the underlying transactions.   Mr. Brown observed a commingling of funds and transactions between the Debtor and Wholesale.  Extensive intercompany transactions were found.  Mr. Brown concluded it is reasonable to conclude both companies were acting as one. [4]

37.     Mr. Brown identified specific indicia of a Ponzi scheme.   For example, the Wholesale bank statement dated 1/31/2012 had a beginning balance of $46,422.00.  There was one $700,000 deposit which was the proceeds of B L Stokes' investment note dated 1/20/2012.  There were checks paid in the amount of $40,041.66.  Most amounts were consistent with the amount of monthly interest payments due on existing investment notes.  Over subsequent months through July 31, 2012, payments made out of that account were consistent with the amount of monthly interest payments due on existing investment notes.  Over that time, deposits to the account were less than interest paid out, leading Mr. Brown to conclude that the source of the interest payments on the investment notes was the new note from B L Stokes.

38.     As an example of intercompany transfers, on 8/14/2012, $500,000 was deposited into the Wholesale Frost account, number XX XXX9741 (the "Wholesale Frost Account").   The deposit slip listed three amounts, to wit: $200,000, $100,000 and $200,000.  These amounts closely resemble the proceeds of three investment notes dated 8/1/2012 for B L Stokes, Daniel Eichenour and Robert Eichenour. The amount of $500,000 was wire transferred from the Wholesale Frost

---

[4] The Trustee anticipates filing suit to substantively consolidate Wholesale and the Debtor into one entity.

Account to a Debtor Chase account number XXXXX9270 (the "Debtor Chase Account") on 8/16/2012. On 8/16/2012, $467,831 was wired from the Debtor Chase Account to Storehouse. It is reasonable to conclude the $500,000 wire received from the Wholesale Frost Account was required to fund the wire to Storehouse Lending.

39.     Mr. Brown has concluded that these transactions demonstrate the existence of a Ponzi or Ponzi like scheme as of early 2012. Mr. Brown's work is ongoing, and the Trustee reserves the right to amend and supplement this Complaint as additional information is learned.

40.     Moreover, records suggest that Investor funds were funneled through Wholesale to the Debtor, and Debtor funds were funneled through Wholesale to Investors, using Wholesale as a conduit. Debtor accounting records show that over the 2012 through 2015 time period, Wholesale transferred $1,354,074.88 to the Debtor, and over that same period, the Debtor transferred $3,534,324.23 to Wholesale (the "Wholesale Transfer"), for a net drain on the Debtor of $2,180,249.35.

**Payments to Investors**

41.     During the Relevant Period, the Debtor made payments to Investors. Investor payments were made to Investors who had notes from the Debtor, as well as, on information and belief, payments to Investors who had notes from Wholesale and/or Morris.

42.     Based on the Debtor's accounting records, on information and belief, a true and correct summary of Fraudulent Transfers paid to Defendant during the Relevant Period is attached hereto and incorporated herein by reference as **Exhibit A**. On information and belief, the total amount of the Fraudulent Transfer made by the Debtor to the Defendant during the Relevant Period is at least **$115,638.09**.

43.     The Debtor's accounting practices leave open the possibility that additional payments should be included in the Fraudulent Transfers. For example, the Debtor routinely

booked groups of transactions as a single accounting entry, making it difficult to tell the true nature and detail of the underlying transactions. On information and belief, Wholesale was also used as a mechanism through which Debtor money was paid to Investors. Accordingly, as used herein, the term Fraudulent Transfers also includes any additional Debtor payments made to Defendant during the Relevant Period that are revealed during the course of the Trustee's investigation and/or discovery in this matter.

44. On information and belief, at least some payments comprising the Fraudulent Transfer were made using the funds of new Investors' investments.

45. Unless and except to the extent otherwise provided for by applicable law or sought herein, the Trustee seeks avoidance and recovery of the Fraudulent Transfers to the extent that the Fraudulent Transfer payments represent profit (the "Net Gain") on Defendant's Investment.

46. On information and belief, each payment comprising the Fraudulent Transfer was made to the Defendant during the Relevant Period, either directly by the Debtor, or by Wholesale as an alter ego of the Debtor, or both.

47. On information and belief, the Debtor booked payments made to Defendant on the Defendant's Investment as interest and/or principal.

48. On information and belief, Defendant received each of the payments and transfers comprising the Fraudulent Transfer.

49. On information and belief, each of the payments comprising the Fraudulent Transfer was made to the Defendant by ACH, check and/or wire transfer from the Debtor Chase Account, (a) to the Defendant; (b) to and through, the Wholesale Frost Account; and/or (c) to and through, a Wholesale account at Frost Bank, account number ending in 9023 (the "Wholesale Operating Account") (collectively, the "Accounts").

50.     On information and belief, each of the payments and transfers summarized on Exhibit A cleared the Accounts during the Relevant Period.

51.     On information and belief, Defendant received the payments comprising the Fraudulent Transfer.

52.     The Defendant was not listed as a creditor in the Debtor's above captioned bankruptcy case.

53.     The Defendant did not file a proof of claim in this bankruptcy case.

**The Impact on Creditors**

54.     On information and belief, the Debtor defaulted under the Storehouse CSA. Storehouse filed an amended proof of claim, Claim No. 15-3 (the "Storehouse Claim"), signed under penalty of perjury, against the Debtor for a general unsecured amount of $37,592,043.74. Other general unsecured claims were filed against the Debtor as well, including one by the bankruptcy trustee for Capital Financial Resources – 001, LP, in the amount of $546,068.91 emanating from a Credit Service Agreement with a different lender dating back to 2009.

55.      The Claims Register for this case reflects, as of September 22, 2017, based on data entered, total claims filed by creditors (the "Filing Creditors") in the amount of $42,066,561.12, of which the amount of $1,757.52 was claimed as secured and the amount of $26,380.05 was claimed as priority, leaving $42,038,423.55 that was presumably claimed as general unsecured claims. [5]

56.     The estate presently has approximately $98,876.02 in it.

57.     The allegations in this Complaint are without prejudice to the assertion of any other claim(s) of the bankruptcy estate against the Defendant.

---

[5] The Trustee reserves all right to review and object to proofs of claim filed if and as appropriate.

## V. FRAUDULENT TRANSFERS UNDER 11 U.S.C. §544(b)(1)
## AND TEX. BUS. & COM. CODE §§24.005 AND 24.008

58.     The allegations contained in paragraphs 1-57 of this Complaint are incorporated as if alleged in full herein.

59.     One or more of the Filing Creditors have a claim that is allowable against the Debtor under section 502 of the Bankruptcy Code or not allowable only under section 502(e) of the Bankruptcy Code.

60.     Under §544(b)(1) of the Bankruptcy Code, the Trustee has the rights of such Filing Creditors to avoid the Fraudulent Transfer under applicable law, including the Texas Uniform Fraudulent Transfer Act.

61.     One or more of the Filing Creditors with allowed claims was a present or future creditor of the Debtor at the time the Fraudulent Transfer was made.

62.     The Trustee asserts that the Debtor made one or more payments comprising the Fraudulent Transfer to the Defendant:

>    a.   with actual intent to hinder, delay, or defraud one or more creditors (present and future) of the Debtor; or
>
>    b.   without receiving reasonably equivalent value in exchange for such Fraudulent Transfer; and the Debtor
>
>    >    i.   was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or
>    >
>    >    ii.  intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond his ability to pay as they became due.

63.     On information and belief, the Fraudulent Transfer, or alternatively, the Net Gain, is, therefore, avoidable by the Trustee pursuant to §544(b)(1) of the Bankruptcy Code and §§ 24.005 and 24.008 of the Texas Business and Commerce Code.

## VI. FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548

64.     The allegations contained in paragraphs 1-63 of this Complaint are incorporated as if alleged in full herein.

65.     In the alternative, and without waiving the foregoing, to the extent applicable, the Trustee asserts that Defendant's Investment should be re-characterized or treated as equity, and the Fraudulent Transfer, or alternatively, the Net Gain, is avoidable pursuant to 11 U.S.C. §548. *See O'Cheskey v. Hous. For Texans Charitable Trust (In re Am. Hous. Found)*, 2012 Bankr. LEXIS 4721 (Bankr. N.D. Tex. 2012) *citing In re Lothian Oil, Inc.*, 650 F. 3d 539 (5th Cir. 2011).

66.     Specifically, Fraudulent Transfer payments, or alternatively, the Net Gain, are avoidable by the Trustee, to the extent they were made during two-year period prior to the Petition Date:

    a.  with actual intent to hinder, delay, or defraud one or more creditors (present and future) of the Debtor; or

    b.  the Debtor received less than a reasonably equivalent value from the Defendant in exchange for the Fraudulent Transfer; and,

        i.  was insolvent on the date that such Fraudulent Transfer was made, or became insolvent as a result of such transfer; or

        ii. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; or

iii. intended to incur, or believed then the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; or

iv. made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

67. The Fraudulent Transfer or, alternatively, the Net Gain, made to Defendant during the two year period prior to the Petition Date is, therefore, avoidable by the Trustee pursuant to 11 U.S.C. § 548(a).

## VII. AVOIDANCE OF PREFERENTIAL TRANSFER UNDER 11 U.S.C. § 547

68. The allegations contained in paragraphs 1-67 of this Complaint are incorporated as if alleged in full herein.

69. In the alternative and without waiving the foregoing, to the extent that payments comprising the Fraudulent Transfer were made within the 90 day period prior to the Petition Date, (the "Preferential Transfer"), and the Defendant alleges that the Preferential Transfer was made for or on account of an antecedent debt owed by the Debtor, then the Trustee asserts as follows:

70. The funds comprising the Preferential Transfer were property of the Debtor.

71. The Preferential Transfer was made to or for the benefit of a creditor of the Debtor.

72. The Preferential Transfer was made to and for the benefit of the Defendant.

73. The Preferential Transfer was made for or on account of an antecedent debt owed by the Debtor before the Preferential Transfer was made.

74. The Preferential Transfer was made while the Debtor was insolvent.

75. The Preferential Transfer was made:

a. on or within 90 days before the Petition Date; or

    b. between 90 days and one year before the Petition Date if the Defendant at the time of such transfer was an insider.

76. The Preferential Transfer enabled the Defendant to receive more than the Defendant would have received if the case were a case under Chapter 7 of Title 11 of the United States Code, the Preferential Transfer had not been made, and the Defendant received payment on its debt to the extent provided by the provisions of the Bankruptcy Code.

77. The Preferential Transfer is, therefore, avoidable pursuant to 11 U.S.C. § 547(b).

**VIII. FRAUDULENT TRANSFER 11 U.S.C. §544(b)(1)
AND TEX. BUS. & COM. CODE §§24.005 AND 24.008 AGAINST WHOLESALE**

78. The allegations contained in paragraphs 1-77 of this Complaint are incorporated as if alleged in full herein.

79. The Trustee asserts that the Debtor made one or more payments comprising the Wholesale Transfer to Wholesale:

    a. with actual intent to hinder, delay, or defraud one or more creditors (present and future) of the Debtor; or

    b. without receiving reasonably equivalent value in exchange for such Wholesale Transfer; and the Debtor

        i. was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or

        ii. intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond his ability to pay as they became due.

80.      The Wholesale Transfer is, therefore, avoidable by the Trustee pursuant to §544(b)(1) of the Bankruptcy Code and §§ 24.005 and 24.008 of the Texas Business and Commerce Code.

## IX. FRAUDULENT TRANSFERS UNDER UU U.S.C. §548 AGAINST WHOLESALE

81.      The allegations contained in paragraphs 1-80 of this Complaint are incorporated as if alleged in full herein.

82.      Specifically, Wholesale Transfer is avoidable by the Trustee, to the extent it was made during two-year period prior to the Petition Date:

    a.  with actual intent to hinder, delay, or defraud one or more creditors (present and future) of the Debtor; or

    b.  the Debtor received less than a reasonably equivalent value from the Defendant in exchange for the Fraudulent Transfer; and,

        i.  was insolvent on the date that such Fraudulent Transfer was made, or became insolvent as a result of such transfer; or

        ii.  was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; or

        iii.  intended to incur, or believed then the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; or

        iv.  made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

83. The Wholesale Transfer is, therefore, avoidable by the Trustee pursuant to §548 of the Bankruptcy Code.

## X. RECOVERY FROM DEFENDANT UNDER 11 U.S.C. § 550(a)

84. The allegations contained in paragraphs 1-83 of this Complaint are incorporated as if alleged in full herein.

85. The Defendant is: (a) an initial transferee of the Fraudulent Transfer; or (b) the entity for whose benefit such Fraudulent Transfer was made; or (c) an immediate or mediate transferee of the initial transferee of such Fraudulent Transfer.

86. Alternatively, and without waiving the foregoing, the Defendant is: (a) an initial transferee of the Preferential Transfer; or (b) the entity for whose benefit such Preferential Transfer was made; or (c) an immediate or mediate transferee of the initial transferee of such Preferential Transfer.

87. Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover for the benefit of the estate from the Defendant the Fraudulent Transfer, or alternatively, the amount of the Net Gain.

88. Alternatively, and without waiving the foregoing, the Trustee is entitled to recover for the benefit of the estate from the Defendant the amount of the Preferential Transfer.

89. In addition to the recovery of the foregoing amount from the Defendant, the Trustee seeks the addition of interest thereon from the date that each payment constituting the avoided Fraudulent Transfer or Preferential Transfer at issue was made to the Defendant until such amount is paid in full.

## XI. RECOVERY FROM WHOLESALE PURSUANT TO 11 U.S.C. §550

90. The allegations contained in paragraphs 1-89 of this Complaint are incorporated as if alleged in full herein.

91.     Wholesale is: (a) an initial transferee of the Wholesale Transfer; or (b) the entity for whose benefit such Wholesale Transfer was made; or (c) an immediate or mediate transferee of the initial transferee of such Wholesale Transfer.

92.     Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover for the benefit of the estate from the Wholesale the amount of the Wholesale Transfer.

**PRAYER**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, Marilyn D. Garner, Chapter 7 Trustee for the bankruptcy estate of KJC Auto Title Loan Corp – North Texas aka Fiesta Automobile Club f/k/a KJC Auto Title Loan Corp respectfully prays that this Court enter judgment in favor of the Trustee and against the Defendant:

1.     Avoiding the Fraudulent Transfer, or alternatively, the Net Gain, to the extent applicable pursuant to §544 of the Bankruptcy Code and Tex. Bus. & Com. Code §§24.005 and 24.008;

2.     Alternatively, and without waiving the foregoing, avoiding the Fraudulent Transfer, or alternatively, the Net Gain, to the extent applicable pursuant to Section 548 of the Bankruptcy Code;

3.     Alternatively, and without waiving the foregoing, to the extent the Fraudulent Transfer is not otherwise avoidable, avoiding the Preferential Transfer in the appropriate amount**;**

4.     Avoiding the Wholesale Transfer pursuant to §544 of the Bankruptcy Code and Tex. Bus. & Com. Code §§24.005 and 24.008;

5.     Alternatively, and without waiving the foregoing, avoiding the Wholesale Transfer to the extent applicable pursuant to Section 548 of the Bankruptcy Code;

6.    For recovery from Defendant of the applicable amount of the Fraudulent Transfer or Net Gain, as appropriate, up to the amount of **$115,638.09** pursuant to Section 550 of the Bankruptcy Code and /or Tex. Bus. & Com. Code §24.008;

7.    Alternatively, and without waiving the foregoing, for recovery from Defendant of the amount of the Preferential Transfer pursuant to Section 550 of the Bankruptcy Code;

8.    Alternatively, and without waiving the foregoing, for recovery of the amount of the Wholesale Transfer from Wholesale;

9.    For pre-judgment interest accruing at the highest lawful rate on the principal amount of each payment made constituting the Fraudulent Transfer, Preferential Transfer or Wholesale Transfer as appropriate;

10.   For reimbursement to the Trustee and the estate, to the extent allowed by law, for all reasonable and necessary professional fees and expenses, including fees and expenses of attorneys and accountants, incurred by the Trustee in the prosecution of this action to avoid the Fraudulent Transfer, Preferential Transfer or Wholesale Transfer made to the Defendant by the Debtor;

11.   For costs of court; and

12.   For such other and further relief, at law or in equity, to which the Trustee may be entitled.

Respectfully submitted,

/s/ Michael W. Sebesta
Michael W. Sebesta
Texas Bar No. 24033171
Majeedah Murad
State Bar No. 24103590
Jordan Montgomery Lewis
State Bar No. 24092691
CAVAZOS, HENDRICKS,
POIROT & SMITHAM, P.C.
Suite 570, Founders Square
900 Jackson Street
Dallas, TX  75202
Phone: (214) 573-7306
Fax: (214) 573-7399
Email: msebesta@chfirm.com

**Attorneys for Marilyn D. Garner, Trustee**